## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

| | | |
|---|---|---|
| ROLAND MOLINA, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-cv-157-AW-CAS |
| | ) | |
| The FLORIDA DEPARTMENT OF | ) | |
| CORRECTIONS, an agency of the state of | ) | |
| Florida; WEXFORD HEALTH SOURCES, | ) | |
| INC., an out of state corporation registered | ) | |
| and doing business in Florida; | ) | |
| CENTURION OF FLORIDA, LLC, an out | ) | |
| of state Corporation registered and doing | ) | |
| business in Florida, and DINA PAUL, in | ) | |
| her individual capacity, | ) | |
| | ) | |
|    Defendants. | ) | |
| _____ | ) | |

## AMENDED COMPLAINT FOR DAMAGES

### Preliminary Statement

1.    This is an action for damages, alleging that Defendants, in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act of 1973, deliberately deprived Plaintiff Roland Molina of medically necessary treatment for hepatitis C, causing him great pain and permanent injury.

**Jurisdiction and Venue**

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

3.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured to the Plaintiff by the Constitution and laws of the United States.

4.      Plaintiff's claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

5.      Plaintiff's claims for relief are also predicated on violations of Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended.

6.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as many of the events or omissions giving rise to the claims occurred in this judicial district, Defendants did substantial business in this judicial district, and

Defendant Florida Department of Corrections is headquartered in Tallahassee, Florida.

## Parties

7.      Plaintiff Roland Molina is a citizen of the United States and is currently incarcerated in the Florida Department of Corrections system at Central Florida Reception Center in Orange County, Florida.

8.      Plaintiff Molina has exhausted all available administrative remedies.

9.      Defendant Florida Department of Corrections (FDC) is an agency of the State of Florida receiving federal funds to operate its agency.  Defendant FDC is headquartered in Tallahassee, Florida.

10.     Defendant Wexford Health Sources, Inc. (Wexford), is an out-of-state corporation, registered and doing business in Florida.  Defendant Wexford, from December 2012 through June 2017, contracted with the Florida Department of Corrections to provide health care services to people confined in FDC prisons, including Hardee Correctional Institution (Hardee), where Plaintiff was housed from July 2013 to June 2017.  From December 2012 until June 2017, Defendants Wexford and FDC were responsible for the health care services for Plaintiff.

11.     Defendant Centurion of Florida, LLC (Centurion), is an out-of-state corporation, registered and doing business in Florida.  In June of 2017, Defendant

Centurion contracted with the FDC to take over Wexford's prisons and provide health care services to all people confined in FDC prisons, including Hardee. From June of 2017 until the present, Defendants Centurion and FDC were responsible for health care services for Plaintiff.

12.     Defendant Dina Paul is a licensed medical doctor who is employed by Wexford. From 2014 through June 2017, Defendant Paul, the Chronic Disease and Case Management Director for Wexford, refused to treat Plaintiff's hepatitis C despite being aware of Plaintiff's serious medical condition and disability.

13.     The actions of the Defendants, as herein alleged, were performed under color of state law and constitute state action.

14.     At all times relevant to this lawsuit, Defendant FDC had a non-delegable duty to provide constitutionally adequate healthcare services to its prisoners.

## The Hepatitis C Virus

15.     Hepatitis C is a blood borne disease caused by the hepatitis C virus (HCV).

16.     Chronic HCV is a serious medical need.

17.    Liver inflammation caused by HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body.

18.    Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

19.    People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring.

20.    Liver scarring caused by HCV can lead to liver cancer.

21.    When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis.

22.    Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue.

23.    If they go untreated, complications from HCV can cause death, often from infection, bleeding, and fluid accumulation.

24.     Starting in 2013, direct-acting antiviral (DAA) drugs became available for patients.

25.     DAAs are oral medications with few side effects that cure HCV at rates of over 95%.

26.     In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA) formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV.

27.     The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org.

28.     The Guidance sets forth the medical standard of care for the treatment of HCV, which is well-established in the medical community.

29.     The AALSD/IDSA panel, through the HCV Guidance, in 2014 recommended treatment with DAA drugs for all persons with chronic HCV.

30.     Since 2014, this has been the standard of care for the treatment of HCV, and it reflects the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

## General Factual Allegations

31.    From late 2013, when DAAs were first available until October of 2017, the FDC and its medical contractors—Wexford and Centurion—failed to provide DAAs to thousands of prisoners with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of prisoners with HCV.

32.    As a result of their refusal to provide DAAs to prisoners, over 100 prisoners died of untreated hepatitis C.   Moreover, hundreds more suffered irreparable liver damage.

33.    It wasn't until the FDC was sued in federal court that the FDC and its contractor Centurion began providing these medications to thousands of prisoners who needed it.   In *Hoffer, McPherson, and Molina, et al., v. Jones*, 17-cv-002140-MW-CAS (N.D. Fla. 2017), the Court found in a preliminary injunction order that FDC's practice of failing to treat prisoners with HCV amounted to deliberate indifference to their serious medical needs, in violation of the Eighth Amendment. Mr. Molina was a named plaintiff and class representative in *Hoffer*.

### *Plaintiff Has a Disability*

34.    Plaintiff Roland Molina has been incarcerated in the FDC system since 2004.  Upon admission, Mr. Molina told FDC that he had HCV.

35.     From July 2013 through June 2017, Wexford was the FDC's medical contractor at Hardee Correctional Institution and was responsible with FDC for Mr. Molina's medical care.

36.     In January 2013, Mr. Molina again told FDC staff that he had HCV and that he had been diagnosed with HCV approximately fifteen years before.

37.     A hepatitis panel was ordered, and Mr. Molina was re-diagnosed with chronic HCV very soon thereafter.

38.     Chronic HCV is a physical impairment that substantially limits the proper function of an individual organ within Plaintiff's body system—i.e., Plaintiff's liver.

39.     Chronic HCV can cause irreversible liver scarring, which significantly impairs liver function and damages the liver's ability to digest nutrients, filter toxins, fight infection, and conduct other metabolic processes in the body.

40.     Plaintiff had a record of such disability because Plaintiff's medical record with FDC is replete from 2013 to the present with laboratory data and physicians' diagnoses consistent with chronic HCV and cirrhosis.

41.     The FDC medical record contains evidence that Plaintiff's liver was severely scarred or cirrhotic by at least July 2013.

42.    In July 2013, testing documented that Plaintiff's blood platelets were at an abnormally low count of 138,000.  A low platelet count is defined as anything less than 150,000.  Low platelet counts are evidence of cirrhosis and abnormal liver function.  Thus, at that time, chronic HCV substantially limited the function of Plaintiff's hemic and circulatory systems by decreasing his blood's ability to clot and carry the necessary nutrients to his body.

43.    Over the next several months and years, the FDC medical record documented a medically dangerous decline in Plaintiff's blood platelet counts. Numerous times, Plaintiff's platelets dropped well below the normal level and persistently remained at a dangerously low range.

44.    The FDC medical record posted the following abnormal platelet counts for Plaintiff:   October 2013: 112,000; November 2013: 117,000; May 2014: 113,000; July 2014: 111,000; January 2015: 90,000; August 2015:  110,000; October 2015:  82,000; June 2016:  112,000; October 2016:  91,000; December 2015: 89,000; February 2017:  80,000; August 2017:  83,000.  Thus, at these times, chronic HCV substantially limited the function of Plaintiff's hemic and circulatory systems by decreasing his blood's ability to clot and carry the necessary nutrients to his body.

45.     As to the October 2015 platelet count of 82,000 and the October 2016 count of 91,000, the FDC record noted that these counts were verified by examination of the peripheral blood smear, indicating they were a true value.

46.     The AST (aspartate aminotransferase) to Platelet Ratio Index, known as an APRI score, determines the likelihood of hepatic fibrosis and cirrhosis in patients with HCV.  An APRI score of 1.5 or higher is evidence of cirrhosis.

47.     The FDC medical record for Plaintiff reported that from October 2013 to April 2017, Plaintiff's APRI scores were all well over 1.5.  The FDC medical record documented the following APRI scores:  October 2013:  2.27; May 2014:  2.52; January 2.52; May 2016:  2.65; April 2017:  3.2.   Thus, at these times, Plaintiff's chronic HCV substantially limited the function of his liver, digestive system, circulatory system, and gastrointestinal system, such that his organs were not able to properly filter toxins from his blood and carry out other necessary functions.

48.     AST     (aspartate     aminotransferase)     and     ALT     (alanine aminotransferase) are enzymes in liver cells.  When the liver is damaged, these enzymes are released into the blood.  An AST level between 10-40 and an ALT level of 7-56 in the blood are considered normal.  Elevated AST and ALT scores are evidence of advanced liver disease.

49.     The FDC medical record for Plaintiff documented that between July 2013 and April 2017, Plaintiff had his blood tested nearly twenty times to check his AST and ALT blood levels. Each time the test showed abnormally high AST and ALT levels.  Thus, at those times, chronic HCV substantially limited the function of Plaintiff's liver and his digestive, gastrointestinal, and circulatory systems such that his organs were not able to properly filter toxins from his blood and carry out other necessary functions.

50.      In March 2017, the FDC medical record documented that Plaintiff had an abdominal ultrasound.  The ultrasound found that Plaintiff had splenomegaly, an abnormal enlargement of the spleen, and portal hypertension, increased blood pressure in the major vein that runs from the intestines to the liver.  An enlarged spleen is a sign of portal hypertension caused by cirrhosis.  An enlarged spleen and portal hypertension are both signs of abnormal liver function.

51.     In the *Hoffer* litigation, Dr. Daniel Dewsnup, Defendant FDC's expert, noted "the report of abdominal US [ultrasound] showing splenomegaly" and found that Plaintiff Molina is "eligible for HCV treatment of HCV-HBV possible co-infection, cirrhosis by lab and imaging criteria."

52.     Also in *Hoffer*, Plaintiff submitted the following Requests for Admission to FDC:  No. 4:  Admit that Roland Molina has an impairment that

substantially limits one or more of his major life activities; No. 8: Admit that there is a record of an impairment that substantially limits one or more of his major life activities; and, No. 14: Admit that the FDC regards Roland Molina as having an impairment that substantially limits one or more of his major life activities. To each of these requests, Defendant FDC responded, "Admit."

53.     Consistent with the FDC medical record documenting his impairment and disability, in 2013 Plaintiff began to experience outward symptoms of cirrhosis and abnormal liver function.

54.     In late 2013, Plaintiff experienced excruciating pain and numbness in his feet and toes. At times, it became so painful that he was unable to walk and had to either sit or lay down. When he was able to walk, he had to do so much more slowly because of the pain. This pain continues today.

55.     In 2014, Plaintiff developed surface bleeding which can be seen on the surface of the skin of his legs, thighs and buttocks. Caused by low platelets, they occur when released blood raises to the surface of his skin and create red blotches. The blotches are painful and sensitive to the touch. Any type of contact with them, including water running over them in a shower, creates extreme pain. At times, it was difficult to shower and/or Plaintiff had to shower much more slowly, or avoided showering altogether. Thus, chronic HCV substantially limited Plaintiff's ability to

care for himself and engage in basic hygienic tasks. Because of low platelets, Plaintiff bruises easily and continues to suffer from this condition today. Thus, at that time, Plaintiff's chronic HCV substantially limited the function of his circulatory system such that his blood was unable to clot properly and unable to be transported properly through his body.

56.     In late 2013, Plaintiff also began to suffer numbness, dryness, and brown discoloration on his legs, feet and toes.

57.     In 2015, Plaintiff began to experience constant fatigue and exhaustion. Some days he was so exhausted he could not walk or move. Plaintiff was advised to limit his exercise and movement due to his low platelet levels. Chronic HCV substantially limited his ability to walk and move. At the same time, despite consuming the same amounts of food, Plaintiff experienced dramatic weight loss, losing over twenty pounds.

58.     From 2016 through 2017, Plaintiff was jaundiced, a classic sign of liver disease.

59.     In 2017, Plaintiff's physical condition began to further deteriorate as he began to lose muscle mass because of his liver's inability to process the proteins that he consumed.

60.     Finally, in December 2018, Plaintiff was diagnosed with Grade III esophageal varices, which are enlarged veins in the throat that are at risk for bursting and bleeding out.  This was first time Plaintiff was tested for varices, which may have developed any time after his liver became cirrhotic.

*The Denial of Care During Defendant Wexford's Contract*

61.     Upon information and belief, high level Wexford officials responsible for medical policy in Florida prisons knew about DAAs when they were first available in 2013.

62.     They also knew that the medical standard of care to treat chronic HCV was immediate treatment with DAAs.

63.     They also knew that thousands of FDC prisoners had HCV and were not receiving DAAs, or any other treatment for it.

64.     Yet, during their entire tenure in Florida, for four years, Wexford refused to treat any patients with DAAs.

65.     Wexford had a policy, practice, and custom of refusing to provide treatment for chronic HCV, in part to save costs and to make larger profits.

66.     Starting in 2014 when he first because aware of DAAs, Mr. Molina repeatedly asked his doctor at Hardee, Dr. Edouard, for hepatitis C treatment.

67.     In late 2014, Dr. Edouard told Mr. Molina that he would not get DAA treatment because Wexford and the FDC were not going to pay for it.

68.     Upon information and belief, in late 2014, Defendant Paul told Dr. Edouard that no DAA treatment could be provided to Mr. Molina because it cost too much.

69.     Upon information and belief, in 2015, Dr. Edouard again asked for DAA treatment for Mr. Molina and was again told that treatment could not be provided because of cost.

70.     In January 2016, Mr. Molina filed a grievance asking for HCV treatment, but it was denied.  He appealed the denial, but it was also denied.

71.     Around April of 2016, Dr. Edouard submitted a request for HCV treatment for Mr. Molina.

72.     On April 20, 2016, Defendant Paul, pursuant to Wexford's policy and practice, denied Dr. Edouard's request for HCV treatment, finding that "patient does not meet current AASLD (November 2015) priority criteria for HCV antiviral therapy."

73.     In fact, Mr. Molina *did meet* the AASLD priority criteria for HCV treatment, and Defendant Paul knew that he met the AASLD priority criteria but refused him treatment anyway.

74.    In April 2017, Dr. Edouard submitted another request for HCV treatment for Mr. Molina.

75.    This time, on April 12, 2017, Defendant Paul rightly found that Mr. Molina did "meet[] AASLD priority criteria for HCV treatment."

76.    However, despite finding that Mr. Molina did qualify under the HCV Guidance to get HCV treatment, Defendant Paul refused to approve Mr. Molina for DAA treatment.

77.     At no point from July 2013 through June 2017 did Defendant Paul approve or recommend DAA treatment for Mr. Molina.

78.    Therefore, from July 2013 through the end of their contract in June 2017, Wexford never provided Mr. Molina with the DAA treatment they knew he needed.

79.    Defendants Wexford and Paul knew that Mr. Molina had chronic HCV, knew that patients with labs that indicated they had cirrhosis should be prioritized for DAA treatment, but denied Mr. Molina DAA treatment.

80.    Mr. Molina was denied DAA treatment from July of 2013 through June of 2017, because Defendants Wexford and FDC had a policy, practice, and custom of not providing direct acting antivirals to patients with HCV, in part to save costs and to make larger profits.

81.    Defendant FDC knew that Mr. Molina was being denied treatment, and knew of Wexford's policy and practice, yet failed to take adequate corrective action.

82.    Because Mr. Molina did not receive HCV treatment from July 2013 through June 2017, he sustained serious damage to his health and has an increased risk of future health complications.

*Denial of Care During Defendant Centurion's Contract*

83.    Centurion replaced Wexford as the FDC's contracted health care vendor in June of 2017 for the prisons in which Wexford operated.  At that point, Centurion became the FDC's contracted health care vendor for the entire state.

84.    Centurion and its high-level officials responsible for medical policy in Florida prisons were aware that thousands of FDC prisoners had untreated HCV.

85.    Centurion and its high-level officials responsible for medical policy in Florida prisons were also aware that the medical standard of care to treat chronic HCV was treatment with DAAs.

86.    Centurion and its high-level officials responsible for medical policy in Florida prisons also were aware that prisoners with chronic HCV and cirrhosis should be prioritized for DAA treatment.

87.    Yet, for a year and a half, from May of 2016 until September of 2017, Centurion treated just six patients with DAAs.

88.    Centurion had a policy, practice, and custom of refusing to provide treatment for chronic HCV.

89.    From June 2017, when Centurion took over Wexford's contract until the present, Centurion was responsible with FDC for Mr. Molina's medical care.

90.    Centurion denied Mr. Molina's DAA treatment from June of 2017 until October of 2017, because Defendants FDC and its new contractor Centurion continued the policy, practice, and custom of not providing DAAs to patients with HCV.

91.    It wasn't until the FDC was sued in federal court in *Hoffer* that the FDC's contractor Centurion began providing DAA treatment to Mr. Molina.

92.    And, indeed, after the lawsuit for injunctive relief was filed on May 11, 2017, Centurion delayed Mr. Molina's HCV treatment for an additional five months until October 11, 2017.

93.    Despite numerous verbal and written requests by Dr. Edouard and Mr. Molina himself, Mr. Molina did not receive treatment until October 11, 2017, as a result of the lawsuit.

94.    Mr. Molina was denied HCV treatment from June of 2017 until October of 2017, because Defendants Centurion and FDC had a policy, practice, and

custom of not providing direct acting antivirals to patients with HCV, in part to save costs and to make larger profits.

95.     FDC knew about the denial of treatment to Mr. Molina, and Centurion's policy and practice, yet failed to take any corrective action.

96.     Because Mr. Molina did not receive HCV treatment from June 2017 to October 2017, he sustained serious damage to his health and has an increased risk of future health complications.

## The Harm to Mr. Molina

97.     Defendants' delay of DAA treatment for over three years has caused irreparable damage to Mr. Molina's liver and spleen.

98.     Mr. Molina has suffered from abnormally low platelet levels caused by his HCV.  As described above, the low platelet levels have caused Mr. Molina to continue to suffer from painful surface bleeding.  He continues to experience extreme fatigue and exhaustion and stills suffers severe pain in his feet.

99.     Mr. Molina's lab tests and medical records indicate that he has cirrhosis, which has worsened due to this delay in treatment.

100.   Further, due to the delay in treatment, Mr. Molina now suffers from varices in his esophagus.  Esophageal varices are enlarged veins that can burst and bleed out causing death.  Mr. Molina was hospitalized on February 1, 2019, to

undergo a banding procedure. Doctors inserted five bands into his esophagus but were unable to eradicate the varices. Mr. Molina was in severe pain after the banding procedure and could not eat solid food for many days. Just drinking water caused him excruciating pain.

101. Varices cannot be fully cured and Mr. Molina is at great risk for developing them again. Indeed, the banding procedure did not fully eradicate them.

102. Also, Mr. Molina's liver condition is getting worse. According to recent medical tests, he has cirrhosis, an enlarged spleen, and fluid in his gastric body (ascites).

103. Defendants' deliberate indifference to Mr. Molina's serious medical needs has caused his quality of life to substantially deteriorate, has caused permanent liver damage, and has caused him to experience daily bodily pain.

104. Mr. Molina is also at heightened risk for developing further symptoms including further advanced liver failure, liver cancer, and death.

105. The willful and deliberate acts of Defendants FDC, Wexford, Paul, and Centurion, in withholding HCV treatment for Mr. Molina, have caused him great physical pain and mental discomfort in his daily activities of living. It has shortened his lifespan and has caused him severe emotional pain and suffering.

**<u>Claims for Relief</u>**

**<u>COUNT I</u>**
**<u>Eighth Amendment Claim Against Defendant Wexford via 42 U.S.C. § 1983</u>**

106.    Plaintiff incorporates and re-alleges each paragraph preceding the Claims for Relief section as if fully set forth herein.

107.    Although persons are sent to the Florida Department of Corrections for punishment for committing a crime, Defendant Wexford, in refusing HCV treatment for Mr. Molina, imposed punishment far in excess of that authorized by law, contrary to the Cruel and Unusual Punishments Clause of the Eighth and Fourteenth Amendments.

108.    Refusing Mr. Molina lifesaving treatment and allowing his liver to deteriorate to severe cirrhosis violated all standards of decency, contrary to the Cruel and Unusual Punishments Clause of the Eighth Amendment, applicable to the states through the Fourteenth Amendment.

109.    Defendant knew that Mr. Molina suffered from a serious medical need, and knew that failing to treat him subjected him to a substantial risk of serious harm.

110.    Defendant's refusal to treat Plaintiff Molina constituted deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment.

111.    Defendant's intentional failure to provide Plaintiff Molina with necessary treatment and instead merely monitoring his deteriorating liver was medical care so cursory as to amount to no medical care at all.

112.    Defendant provided Mr. Molina with grossly inadequate care.

113.     As a direct and proximate cause of Defendant's policy, practice, and custom, and deliberate indifference to Plaintiffs' serious medical needs, Plaintiff has suffered, and will to continue to suffer from, harm.

## COUNT II
## Eighth Amendment Claim Against Defendant Centurion via 42 U.S.C. § 1983

114.    Plaintiff incorporates and re-alleges each paragraph preceding the Claims for Relief section as if fully set forth herein.

115.    Although persons are sent to the Florida Department of Corrections for punishment for committing a crime, Defendant Centurion, in refusing HCV treatment for Mr. Molina, imposed punishment far in excess of that authorized by law, contrary to the Cruel and Unusual Punishments Clause of the Eighth and Fourteenth Amendments.

116.    Refusing Mr. Molina lifesaving treatment and allowing his liver to deteriorate to severe cirrhosis violated all standards of decency, contrary to the Cruel and Unusual Punishments Clause of the Eighth Amendment, applicable to the states through the Fourteenth Amendment.

117.    Defendant knew that Mr. Molina suffered from a serious medical need, and knew that failing to treat him subjected him to a substantial risk of serious harm.

118.    Defendant's refusal to treat Plaintiff Molina constituted deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment.

119.    Defendant's intentional failure to provide Plaintiff Molina with necessary treatment and instead merely monitoring his deteriorating liver was medical care so cursory as to amount to no medical care at all.

120.    Defendant provided Mr. Molina with grossly inadequate care.

121.    As a direct and proximate cause of Defendant's policy, practice, and custom, and deliberate indifference to Plaintiffs' serious medical needs, Plaintiff has suffered, and will to continue to suffer from, harm.

## COUNT III
## Eighth Amendment Claim Against Defendant Paul via 42 U.S.C. § 1983

122.    Plaintiff incorporates and re-alleges all paragraphs preceding the Claims for Relief section as if fully set forth herein.

123.    Although persons are sent to the Florida Department of Corrections for punishment for committing a crime, Defendant Paul, in refusing HCV treatment for Mr. Molina, imposed punishment far in excess of that authorized by law, contrary

to the Cruel and Unusual Punishments Clause of the Eighth and Fourteenth Amendments.

124.    Refusing Mr. Molina lifesaving treatment and allowing his liver to deteriorate to severe cirrhosis violated all standards of decency, contrary to the Cruel and Unusual Punishments Clause of the Eighth Amendment, applicable to the states through the Fourteenth Amendment.

125.    Defendant knew that Mr. Molina suffered from a serious medical need and knew that failing to treat him subjected him to a substantial risk of serious harm.

126.    Defendant's refusal to treat Plaintiff Molina constituted deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth and Fourteenth Amendments.

127.    Defendant's intentional failure to provide Plaintiff Molina with necessary treatment and instead merely monitoring his deteriorating liver was medical care so cursory as to amount to no medical care at all.

128.    Defendant Paul provided Mr. Molina with grossly inadequate care.

129.    Defendant Paul's denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

130.    Plaintiff suffered harm as a direct and proximate result of Defendant Paul's constitutional violation.

## COUNT IV
## Americans with Disabilities Act Claim Against Defendant FDC

131.    Plaintiff incorporates and re-alleges all paragraphs preceding the Claims for Relief section as if fully set forth herein.

132.    This count is brought under Title II of the Americans with Disabilities Act (ADA), 42. U.S.C. § 12131 – 12134, and its implementing regulations.

133.    Subtitle A of Title II of the Americans with Disabilities Act (ADA) prohibits public entities from discriminating against persons with disabilities in their programs, services, and activities.   42. U.S.C. §§ 12131 – 12134.   Regulations implementing subtitle A are codified at 28 C.F.R. part 35.

134.    Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1)(A) and 28 C.F.R. §§ 35.104 & 35.130(b)(1).

135.    Plaintiff Molina is a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12102(2) and 28 C.F.R. § 35.104, because chronic HCV is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment.

136.     Mr. Molina's chronic HCV and permanent liver damage substantially limits one of or more of his major life activities, including but not limited to eating, drinking, walking, standing, and working; the operation of major bodily functions such as his digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of his liver.  42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

137.     Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

138.     Defendant FDC kept a record of Plaintiff Molina's impairment due to HCV.  42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

139.     Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceived him as having such an impairment.  42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f).  Defendant FDC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

140.      Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation

in programs or activities provided by Defendant FDC, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

141.    By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excluded Plaintiff from participation in, and denied him the benefits of, FDC services, programs, and activities (such as medical services) by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

142.    Defendant FDC failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

143.    Defendant FDC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

144.    DAAs were readily available to Defendant FDC during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

145.    Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

146.     Moreover, Defendant FDC owed Plaintiff a non-delegable duty to ensure that his wellbeing would not be compromised as a result of discrimination based on his disability.  Accordingly, Defendant FDC is vicariously liable for the actions of any and all persons or entities Defendant FDC designated to care for Plaintiff.

147.     As a direct and proximate cause of Defendant FDC's actions and omissions, Plaintiff has suffered harm and violation of his ADA rights.

## COUNT V
## Rehabilitation Act Claim Against Defendant FDC

148.     Plaintiff incorporates and re-alleges all paragraph preceding the Claims for Relief section as if fully set forth herein.

149.     This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

150.     Defendant FDC is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

151.     Defendant FDC excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

152.    Defendant FDC subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

153.    Defendant FDC denied Plaintiff—a qualified individual with a disability—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

154.    Defendant FDC utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of disability, and defeat or substantially impair accomplishment of the objectives of FDC's programs or activities with respect to persons with disabilities. 28 C.F.R. § 42.503(b)(3).

155.    Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

156.    As a direct and proximate cause of Defendant FDC's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his rights under the Rehabilitation Act.

## **Prayer For Relief**

WHEREFORE, the Plaintiff, Roland Molina, demands judgment against all Defendants and requests the following relief:

A. A declaration that Defendants Wexford, Paul, and Centurion have violated Plaintiff Molina's Eighth Amendment rights and that Defendant FDC has violated Mr. Molina's rights under the ADA and Rehabilitation Act;

B. Compensatory damages against all Defendants;

C. Punitive damages against Defendants Wexford Paul, and Centurion;

D. All pre and post judgment interest allowable under law;

E. Attorneys' fees, costs, and expenses of litigation incurred under 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 42 U.S.C. § 1988; and

F. Such other relief that may be appropriate.

## Jury Demand

Plaintiff demands trial by jury on all counts alleged above.

Respectfully submitted,

Dante P. Trevisani, Esq.
Florida Bar No. 72912
E-mail:
*DTrevisani@FloridaJusticeInstitute.org*
Erica A. Selig, Esq.
Florida Bar No. 0120581
E-mail: *ESelig@FloridaJusticeInstitute.org*
Raymond Taseff
Florida Bar No. 352500
E-mail: *RTaseff@FloridaJusticeInstitute.org*

Florida Justice Institute, Inc.
100 S.E. 2nd Street

3750 Miami Tower
Miami, Florida 33131-2309
305-358-2081
305-358-0910 (FAX)

By:   *s/Dante P. Trevisani*
      Dante P. Trevisani, Esq.

By:   *s/Raymond Taseff*
      Raymond Taseff, Esq.

By:   *s/Erica Selig*
      Erica Selig, Esq.

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 3, 2020, the foregoing Amended

Complaint was filed and served electronically on all counsel of record or *pro se*

parties pursuant to the ECF/CM system and as identified on the attached Service List

in the manner specified.

By:     *s/Ray Taseff*
                    Ray Taseff, Esq.


**Via Email:  ECM/CF**

Alexander Dombrowsky
Florida Bar No. 186260
Katherine Hunter
Florida Bar 981877
Chimpoulis & Hunter, P.A.
150 South Powerline Road, Ste. 510
Plantation, FL 33324
954-463-0033
Fax: 954-463-9562
adombrowdky@chimpoulishunter.com
khunter@chimpoulishunter.com
llake@chimpoulishunter.com
**Counsel for Wexford and Paul**

Erin Oliver, Esq.
Senior Assistant Attorney General
FBN: 21177
Office of the Attorney General
State Programs Litigation
The Capitol - PL 01
Tallahassee, FL 32399-1050

(850) 414-3670
Fax: (850) 488-4872
Erin.Oliver@myfloridalegal.com
**Counsel for FDC**

R. Craig Mayfield, Esq.
Florida Bar No. 0429643
Brian Wahl, Esq.
Florida Bar No. 9577
Eliot Peace, Esq.
Florida Bar No. 124805
Bradley Arant Boult, etc. LLP
100 North Tampa Street, Suite 2200
Tampa, FL  33602
cmayfield@bradley.com
bwahl@bradley.com
epeace@bradley.com
sjenkins@bradley.com
813-559-5500
Fax:  813-229-5946
**Counsel for Centurion**